Pigeonly, Inc.                                                                                             Case number: 24-10355-nmc

| Fill in this information to identify the case: |
|---|
| Debtor Name  PIGEONLY INC. dba FOTOPIGEON |
| United States Bankruptcy Court for the: District of Nevada (State) |
| Case number:  24-10355-nmc |

☐  Check if this is an amended filing

Official Form 425A

# Plan of Reorganization for Small Business Under Chapter 11         02/20

**PIGEONLY, INC.'S CHAPTER 11 PLAN OF REORGANIZATION, DATED APRIL 25, 2024**

### Background for Cases Filed Under Subchapter V

A.  **Description and History of the Debtor's Business.**

　　1.  **Debtor's Original Consumer Services.**

Pigeonly Inc. ("Debtor"), a Delaware corporation, was founded by Frederick Hutson and Alfonzo Brooks in 2013. Debtor started as an easy way to share photos with incarcerated family and friends from one's mobile device. Since 2013, Debtor has been building technology products for the overlooked and underserved, having launched multiple products that address and solve communication barriers between inmates and their support network of family and friends. These technology-driven products include: (i) allowing users to fund an inmate's commissary or inmate's trust account using a credit card, debit card, prepaid card, or bank account transfer; (ii) facilitating phone calls by providing the lowest inmate phone rate possible so inmates can call their loved ones without prohibitively significant expense; (iii) sending letters to inmates at any county, state, or federal correctional facility (users can write a letter from their phone, tablet, or computer and Debtor handles the actual mailing; (iv) by using Debtor's postcard app, users can create and send custom postcards (including short videos) to inmates – all from their phone or computer; (v) using Debtor's technology, users can create and send custom greeting cards, which can be signed by the whole family or groups of friends, again, from their phone or computer; and (vi) sending articles to inmates, allowing them to stay current on important events, politics, trends, and current events. Today, Debtor has over 4,000 active paying consumer customers using its services to connect with their incarcerated loved ones.

　　2.  **The Pivot to Add Government Services.**

In 2020, Debtor had gross revenue of $1.58 million, which grew to $3.55 million in 2021. Unfortunately, in late 2022, Debtor faced two challenges. First, due to chargebacks exceeding 2%, Stripe (Debtor's payment processor) refused to continue processing credit card payments from Debtor's users. Additionally, Debtor lost the revenue from its offering of VoIP services. The result was a sharp decline in revenue. In 2022, Debtor's gross revenue, significantly decreased in the fourth quarter, resulting in annual gross income of $3 million, which further decreased to $1.15 million in 2023. During this challenging period, to ensure Debtor's survival, Debtor took on significant debt, and its trade payables significantly increased.

       To combat the declining revenue and increasing debt, Debtor pivoted its business model to provide services to government entities. Specifically, Debtor came to understand that county, state, and federal correctional facilities face significant challenges with mail sent directly to inmates, including the mailing of contraband and illegal drugs (including deadly amounts of fentanyl) that risk the life and safety of not only the inmates, but also corrections personnel, which issues do not arise when mail is sent through Debtor's services. Understanding this, Debtor strategically redirected its focus to adding services that solve this serious problem by offering mail scanning services for both local and state correctional facilities, thereby playing a crucial role in preventing the flow of contraband.

       The significance of this service is underscored by the prevalence of postal mail as one of the most commonly exploited methods for introducing illicit and dangerous substances, such as fentanyl, into correctional institutions. Thus, Debtor protects government employees from dangerous substances and has proven to limit contraband within the inmate population that results in overdoses and, in some cases, death. By way of illustration, a corrections facility will require all inmate mail be sent to a central location operated by Debtor, at which Debtor opens, digitally scans, and copies all incoming inmate mail, providing the corrections facility with searchable PDF scans within a dashboard created and maintained by Debtor. The corrections facility can then electronically review and search the mail and determine whether it is approved to be sent to the inmate. Each approved mail item is then printed and repackaged in a "Pigeonly Corrections" created envelope bearing the inmate and sender's name and a unique one-time-use QR code and a parcel number for tracking and security. Debtor then destroys all contraband or other impermissible items in accordance with the facilities' guidelines. These procedures are made public such that anyone sending mail to a participating correction facility will know that their original mail will not be delivered to the inmate and instead a reproduced copy will be delivered, thereby eliminating any incentive to send contraband through the mail.

       Debtor's services are unique in that Debtor provides tangible mail to inmates, while other service providers *only* provide electronic copies. Among other issues with competitors' services, inmates do not have their own mobile devices, access to computers/tablets is very limited, and where they are provided, they are communal. There are also significant issues with certain inmates being provided any access to communal spaces and technology, as well as technological competency problems. All of this means inmates may not receive their mail. As a result, certain of Debtor's competitors have been involved in lawsuits for claims involving violation of an inmate's First Amendment rights to send and receive mail. Because Debtor provides tangible mail to inmates, Debtor does not face any of these issues. Not only does Debtor provide tangible mail to inmates after inspection, but when reprinting, Debtor uses card stock for postcards and cards and photopaper for photographs to mirror the original item and preserve its look and feel.

       Debtor's pivot to providing its postal mail contraband elimination services to governmental entities at the federal, state, and county level have been successful. Debtor currently has more than ten executed contracts with governmental entities to provide its services, many of which have three-year terms, with renewal options. Debtor has additional government contracts under negotiation.

       While Debtor's change in its business operations is positive, the sale cycle for the government contracts is often nine months to a year, or more. As such, growth has been slow and Debtor has been unable to repay its debts, thus necessitating this bankruptcy case in order to restructure Debtor's significant debt to allow Debtor to continue operating, to maintain its employees, to service and grow its government contracts and consumer customers, and repay its debts in accordance with this Plan.

       **3.**    **Rejection of the Plan will Result in Virtually No Payments to Creditors.**

       As described more fully, in Debtor's Schedules and Statements, the value of Debtor's assets if liquidated totals, at best, $455,012.36 [ECF No. 50]. U.S. Eagle Federal Credit Union has a lien on all these assets and Balboa Capital Corporation has a lien on certain scanners. *Id.* If the Plan is not approved, U.S. Eagle Federal Credit Union and Balboa Capital Corporation will foreclose and take all of Debtor's assets leaving nothing for other creditors. Please review the liquidation analysis at **Exhibit 1** for more information of what happens to creditors if the Plan is not confirmed.

**If this Plan is <u>not</u> approved by the Bankruptcy Court, the result will be to close Debtor's business and liquidate its assets, in which scenario U.S. Eagle Federal Credit Union and possibly Balboa Capital Corporation will foreclose and obtain Debtor's assets worth a small fraction of their claims.  No other creditor will receive anything.  Debtor asks that you vote in favor of the Plan as it will ensure significant payment to creditors.  For the avoidance of doubt, if you do not vote in favor of the Plan, $0.00 will be paid to anyone other than U.S. Eagle Federal Credit Union and Balboa Capital Corporation.  See Exhibit 1.  <u>Debtor strongly recommends that you vote to approve this Plan.</u>**

4. **Procedural History in the Chapter 11 Case.**

The purpose of this bankruptcy case is to preserve Debtor's business, restructure its debt, and to allow Debtor to continue operating in the ordinary course.

On January 26, 2024 (the "<u>Petition Date</u>"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing this bankruptcy case (the "<u>Chapter 11 Case</u>") and elected to be treated under Subchapter V.  Accordingly, Debtor is authorized to continue operating its businesses as a debtor in possession pursuant to section 1184 of the Bankruptcy Code.  Nathan F. Smith has been appointed Subchapter V Trustee in this case.  ECF No. 8.

On the Petition Date, Rulon Huntsman of Reliance Law Firm, LLC was counsel for Debtor on the Petition Date.  ECF No. 1.  On February 6, 2024, Michael Brock of May Brock Law Group associated in as co-counsel for Debtor.  ECF No. 15.  On March 8, 2024, Garman Turner Gordon LLP substituted in as proposed counsel for Debtor.  ECF No. 22.  On March 13, 2024, Garman Turner Gordon LLP filed its application to be employed as Debtor's bankruptcy counsel, which application was approved by entry of an order of this Court on April 17, 2024 [ECF Nos. 23 and 64].

The Debtor's Initial Debtor Interview with the Office of the U.S. Trustee occurred on February 21, 2024, and its section 341(a) meeting of creditors was commenced on February 29, 2024, and was thereafter continued to March 21, 2024 [ECF No. 21] and concluded on April 11, 2024 [ECF No. 63].

On March 15, 2024, Debtor filed its *Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 506, and Fed. R. Bankr. P. 4001(b) for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Scheduling a Final Hearing* [ECF No. 29] (the "<u>Cash Collateral Motion</u>") seeking authorization to use its cash collateral to the extent U.S. Eagle Federal Credit Union could establish a lien in Debtor's cash.  The Cash Collateral Motion was approved on an interim basis by entry of an Order of this Court on March 27, 2024 [ECF No. 46].  Debtor and U.S. Eagle Federal Credit Union are seeking to reach a consensual resolution with respect to the Cash Collateral Motion.  If an agreement cannot be reached, the final hearing on the Cash Collateral Motion is scheduled for May 14, 2024.

5. **The Procedures Motion.**

Debtor has filed a motion seeking entry of an order approving deadlines and procedures related to this Plan, including the scheduling of a confirmation hearing on the Plan, voting deadlines, and related matters (the "<u>Procedures Motion</u>").  The Procedures Motion is set for hearing on June 11, 2024, at which time the Court will schedule the confirmation hearing.  At the confirmation hearing, the Debtor will be seeking entry of a confirmation order approving this Plan with respect to all creditors and equity security holders.

B. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation analysis is attached to the Plan as **Exhibit 1.**

C. **Ability to make future plan payments and operate without further reorganization**

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate its business. The Debtor has provided its projected financial information as **Exhibit 2.** The Debtor's financial projections show that it will have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) of $2,199,023 over the next three years. The final Plan payment to general unsecured creditors, priority creditors, and Balboa Capital Corporation is expected to be paid in September 2027 assuming the Plan goes effective in October 2024; secured and priority tax claims will be paid over five (5) years; the SBA Loan will be paid over thirty (30) years as contemplated by the SBA Loan Documents; the Gratitude Railroad Claim will be paid over seven (7) years with payments starting in year four (4); and the U.S. Eagle Federal Credit Union Claim will be paid over seven (7) years. This timetable may change if confirmation of the Plan is delayed. The Debtor's projections are *pro forma* projections and premised on what it believes are reasonable assumptions.

The projections are based on Debtor's current consumer operations and government contracts, with labor and materials increasing as Debtor anticipates executing additional government contracts and increasing its consumer customers. Debtor's experience is often government entities prefer starting a new contract in January or July and Debtor's projections were prepared accordingly.

In the three years after the Effective Date, Debtor projects net disposable income of $2,199,023 for the three years following the Effective Date and the Plan provides for $2,199,023 of payments to be made to Debtor's creditors in the three years following the Effective Date as follows: (i) $70,000 to Allowed administrative claims; (ii) $86,220 to Allowed Priority tax claims; (iii) $186,084 to Allowed priority unsecured claims; (iv) $1,353,636 to U.S. Eagle Federal Credit Union; (v) $12,852 to the IRS for its secured claims; (vi) $107,460 to Balboa Capital corporation; (vii) no less than $290,071 to holders of Allowed general unsecured claims; and (viii) $92,700 to the U.S. Small Business Administration on account of its claim. For many of these creditors, payments will continue after the three-years. Please consult Article 4 for a detailed description of the treatment of your claim or interest.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

# Article 1: Summary

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay Debtor's creditors from its income from its continued operations.

This Plan provides for:  **1** class of priority claims;

**4** classes of secured claims;

**3** classes of non-priority unsecured clams;

**2** classes of warrants and SAFEs; and

**1** class of equity security holders.

Non-priority unsecured creditors holding allowed claims in Class 6 will receive distributions, which Debtor's Plan has valued at no less than twenty cents on the dollar and it may be higher. This Plan also provides for the full payment of administrative and priority claims.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

# Article 2: Classification of Claims and Interests

| | | |
|---|---|---|
| 2.01 | **Class 1** | All **allowed general unsecured claims entitled to Priority** under § 507(a) of the Code (except administrative expense claims under § 507(a)(2) and priority tax claims under § 507(a)(8)). |
| 2.02 | **Class 2** | The claim of **U.S. Eagle Federal Credit Union**, to the extent Allowed as a secured claim under § 506 of the Bankruptcy Code, and arising from the U.S. Eagle Loan Documents, in the original principal amount of $3,075,000, as more particularly set forth in Proof of Claim No. 11 filed in this Chapter 11 Case. |
| 2.03 | **Class 3** | The claim of the **Internal Revenue Service**, to the extent Allowed as a secured claim under § 506 of the Bankruptcy Code, as more particularly set forth in Proof of Claim No. 3 filed in this Chapter 11 Case. |
| 2.04 | **Class 4** | The claim of **Balboa Capital Corporation**, to the extent Allowed as a secured claim under § 506 of the Bankruptcy Code, arising from the Equipment Financing Agreement No. B401364-000 dated on or about April 6, 2022. |
| 2.05 | **Class 5** | The claims of any **Other Secured Claims**, to the extent Allowed as a secured claim under § 506 of the Bankruptcy Code.  This class includes any claim that is secured by a lien on property in which the Debtor's bankruptcy estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of an order of the Bankruptcy Court, but only to the extent of the value of the applicable creditor's interest in the bankruptcy estate's interest in such property.  Each claim in Class 5 shall be considered within its own separate subclass. |
| 2.06 | **Class 6** | All **Non-Priority General Unsecured Claims** as are Allowed under § 502 of the Bankruptcy Code, including any unsecured claims of any secured creditors resulting from the bifurcation of their claims pursuant to § 506 of the Bankruptcy Code (except Class 7 and Class 8 Claims shall not be Class 6 non-priority general unsecured claims). |
| 2.07 | **Class 7** | The claim of the **U.S. Small Business Administration**, to the extent Allowed as an unsecured claim under § 502 of the Bankruptcy Code, and arising from the SBA Loan Documents, in the original principal amount of $500,000, as more particularly set forth in Proof of Claim No. 7 filed |

|      |          |   |
|------|----------|---|
| | | in this Chapter 11 Case. |
| 2.08 | **Class 8** | The **Gratitude Railway Claim**, being the claims and interests arising from or in connection with the: (i) Pigeonly, Inc. Revenue Loan Agreement dated March 9, 2022, by and between Gratitude Railroad Venture LLC and Debtor; (ii) Pigeonly, Inc. Revenue Loan Agreement dated November 7, 2022, by and between Gratitude Railroad Venture LLC and Debtor; and (iii) Warrants to Purchase Shares of Common Stock issued by Debtor to Gratitude Railroad Venture LLC. |
| 2.09 | **Class 9** | All claims or interests arising from or in connection with the **SAFEs** (see Article 8 for definition). |
| 2.10 | **Class 10** | All claims or interests arising from or in connection with the **Warrants** (see Article 8 for definition), which are subordinated by operation of § 510 of the Bankruptcy Code (solely excluding the Warrants included in Class 8). |
| 2.11 | **Class 11** | All **Allowed Equity Interests** of the Debtor (see Article 8 for definitions). |

## Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, & Fees

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under section § 1123(a)(1), administrative expense claims and priority tax claims are not in classes. |
| 3.02 | **Administrative expense claims** | Each Allowed administrative claim shall be paid upon the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable, (iii) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and the Reorganized Debtor, and the holder of the Administrative Claim shall agree upon.  For the avoidance of doubt, trade accounts payable, accrued expenses, and other liabilities of the Debtor arising in the ordinary course of business after the Petition Date will continue to be paid in the ordinary course of business from Cash on hand and cash flow based on the terms of the agreement with each respective vendor. |
| | | The deadline for filing requests for allowance of administrative expense claims shall be thirty (30) days after the Effective Date.  In the event any request for allowance of an administrative expense claim is not filed by this deadline, then it shall be forever barred and unenforceable against the Debtor or Reorganized Debtor. |
| 3.03 | **Priority tax claims** | As required by 11 U.S.C. § 1129(a)(9), the holders of Allowed priority tax claims will be paid in full in cash in equal monthly installments of their Allowed claims, plus interest at the statutory rate, for the sixty (60) months following the Effective Date.  Such monthly payments shall commence by the fifteenth (15th) of the month following the Effective Date, or the date their claim is Allowed on a final basis, whichever is later, and continue to be made by no later than the fifteenth (15th) of each month thereafter until paid in full with statutory interest. |
| 3.04 | **Statutory fees** | Not applicable pursuant to 28 U.S.C. § 1930(a)(6)(A), however, to the extent any are owed they will be paid in full by the Effective Date. |

| | | |
|---|---|---|
| 3.05 **Prospective quarterly fees** | | All quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. |

## Article 4: Treatment of Claims and Interests Under the Plan

4.01  **Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | Treatment |
|---|---|---|
| **Class 1 - Priority unsecured claims** (excluding those in Article 3) | ☒ Impaired<br>☐ Unimpaired | Each holder of an Allowed priority unsecured claim, shall, in full and final satisfaction of such claim, be paid in full with quarterly payments made by the Reorganized Debtor. The payments shall be made by the fifteenth (15th) day of the last month of each calendar quarter after the Effective Date (being December, March, June, and September) and continue until the Class 1 claims are paid in full with interest, which is anticipated to be three (3) years.<br><br>Class 1 is impaired and entitled to vote on the Plan. |
| **Class 2 – Secured claim of U.S. Eagle Federal Credit Union** | ☒ Impaired<br>☐ Unimpaired | If U.S. Eagle Federal Credit Union does not make the election under 11 U.S.C. § 1111(b), on the Effective Date, the U.S. Eagle Loan Documents shall remain in full force and effect, save and except that: (i) without any further action by Debtor, Reorganized Debtor, or U.S. Eagle Federal Credit Union, all of the U.S. Eagle Loan Documents shall be deemed to have been amended as follows: (i) the principal balance shall be the Allowed secured claim of U.S. Eagle Federal Credit Union; (ii) the maturity date shall be the seventh (7th) anniversary after the Effective Date; (iii) for each month after the Effective Date until the new maturity date, Reorganized Debtor shall make monthly principal and interest payments on the new principal balance at the contract rate of interest; and (iv) on and after the Effective Date, all financial covenants set forth in the U.S. Eagle Loan Documents shall be of no force and effect.<br><br>If U.S. Eagle Federal Credit Union makes the election under 11 U.S.C. § 1111(b), on the Effective Date, the U.S. Eagle Loan Documents shall remain in full force and effect, save and except that: (i) without any further action by Debtor, Reorganized Debtor, or U.S. Eagle Federal Credit Union, all of the U.S. Eagle Loan Documents shall be deemed to have been amended as follows: (i) the principal balance shall be the Allowed claim of U.S. Eagle Federal Credit Union; (ii) the maturity date shall be the seventh (7th) anniversary after the Effective Date; (iii) no interest shall accrue on the new principal balance; (iv) the new principal balance shall be repaid in equal monthly payments from the Effective Date through the new maturity date, which monthly payments are estimated to be $37,601.00; and (v) on and after the Effective Date, all financial covenants set forth in the U.S. Eagle Loan Documents shall be of no force and effect.<br><br>For the avoidance of doubt, U.S. Eagle Federal Credit Union shall retain all of its liens in and to any and all of its collateral consistent with the U.S. Eagle Loan Documents. |

| | | |
|---|---|---|
| | | Class 2 is impaired and entitled to vote on the Plan. |
| **Class 3 – Secured claim of the Internal Revenue Service** | ☒ Impaired<br>☐ Unimpaired | The holder of the Class 3 Allowed secured claim, shall, in full and final satisfaction of such claim, be paid in full with interest at the statutory rate in sixty (60) equal monthly installments made by the Reorganized Debtor. Such monthly payments shall commence by the fifteenth (15th) of the month following the Effective Date, or the date their claim is Allowed on a final basis, whichever is later, and continue to be made by no later than the fifteenth (15th) of each and every month thereafter until paid in full.<br><br>For the avoidance of doubt, the Internal Revenue Service shall retain its liens in and to any and all of its collateral.<br><br>Class 3 is impaired and entitled to vote on the Plan. |
| **Class 4 – Secured claim of Balboa Capital Corporation** | ☒ Impaired<br>☐ Unimpaired | The holder of the Class 4 Allowed secured claim, shall, in full and final satisfaction of such claim, be paid in full in thirty-six (36) equal monthly installments made by the Reorganized Debtor. Such monthly payments shall commence by the fifteenth (15th) of the month following the Effective Date, or the date their claim is Allowed on a final basis, whichever is later, and continue to be made by no later than the fifteenth (15th) of each and every month thereafter until paid in full.<br><br>For the avoidance of doubt, Balboa Capital Corporation shall retain its liens in and to any and all of its collateral.<br><br>Class 4 is impaired and entitled to vote on the Plan. |
| **Class 5 – Other Secured claims** | ☒ Impaired<br>☐ Unimpaired | Any holder of an Allowed secured claim that is not otherwise separately classified in this Plan (if any) shall, in full and final satisfaction of such claim, be paid in full with interest at the statutory rate in equal monthly installments made by the Reorganized Debtor over a period of ten (10) years after the Effective Date. Such monthly payments shall commence by the fifteenth (15th) of the month following the Effective Date, or the date their claim is Allowed on a final basis, whichever is later, and continue to be made by no later than the fifteenth (15th) of each and every month thereafter until paid in full.<br><br>For the avoidance of doubt, each holder of a Class 5 Allowed secured claim shall retain its liens in and to any and all of its collateral.<br><br>Class 5 is impaired and entitled to vote on the Plan. |
| **Class 6 – Non-priority general unsecured claims** | ☒ Impaired<br>☐ Unimpaired | Each holder of a Class 6 Allowed non-priority general unsecured claim shall receive its *pro rata* share of $290,071, plus any portion of the $70,000 allocated for administrative claims remaining after payment of the Allowed administrative claims. These payments |

|  |  |  |
|---|---|---|
|  |  | shall be made by the fifteenth (15th) day of the last month of each calendar quarter after the Effective Date (being December, March, June, and September) for the three (3) years after the Effective Date for a total of twelve (12) payments.<br><br>If the Allowed secured claims in Classes 2, 3, 4, and 5 are less than projected on Exhibit 2, the net difference in the payments between the projected payments to Classes 2, 3, 4, and 5 on Exhibit 2 and the actual payments to holders of Allowed secured claims during the three (3) years after the Effective Date shall be paid to the holders of Class 6 Allowed nonpriority general unsecured claim on the thirty-sixth (36) month after the Effective Date.<br><br>Class 6 is impaired and entitled to vote on the Plan. |
| **Class 7 – U.S. Small Business Administration Claim** | ☒ Impaired<br>☐ Unimpaired | On the Effective Date, the SBA Loan Documents shall remain in full force and effect, save and except that: (i) without any further action by Debtor, Reorganized Debtor, or the U.S. Small Business Administration, all of the SBA Loan Documents shall be deemed to have been amended as follows: (i) the principal balance shall be the Allowed claim of the U.S. Small Business Administration; (ii) the maturity date shall be the thirtieth (30th) anniversary after the Effective Date; (iii) starting on the first month after the Effective Date and each month thereafter until the new maturity date, Reorganized Debtor shall make monthly principal and interest payments of $2,575.00; and (v) on and after the Effective Date, all financial covenants set forth in the SBA Loan Documents shall be of no force and effect.<br><br>Class 7 is impaired and entitled to vote on the Plan. |
| **Class 8 – Gratitude Railway Claims** | ☒ Impaired<br>☐ Unimpaired | The holders of the Gratitude Railway Claims shall receive a payment-in-kind promissory note in the principal amount of $1,500,000, containing the following principal terms: (i) a seven (7) year maturity date; (ii) payment-in-kind interest accruing at fifteen percent (15%) annually; (iii) repayment shall begin the thirty-seventh (37th) month after the Effective Date; (iv) the payment amount shall be fifty percent (50%) of net revenue after debt service (including payments due under this Plan), operating costs, and an operating cash reserve of $500,000; and (v) the note may be converted to common stock at a $20 million valuation on any outstanding principal amount due and owing on the maturity date.  The holders of the Gratitude Railway Claims shall retain their Warrants existing on the Petition Date.<br><br>Class 8 is impaired and entitled to vote on the Plan. |
| **Class 9 – SAFEs claims or interests** | ☒ Impaired<br>☐ Unimpaired | Any equity security interests or rights granted by or in connection with the SAFEs will be cancelled, annulled, and extinguished on the Effective Date and each SAFE Investor shall waive any right to assert a Class 6 General Unsecured Claim.  In exchange for such cancellation and waiver, each SAFE Investor shall receive in full satisfaction of its rights under its SAFE a Subordinated SAFE Note in the principal amount that the SAFE Investor originally |

| | | |
|---|---|---|
| | | invested in Debtor. See Section 8 for the definition of Subordinated SAFE Note.<br><br>Class 9 is impaired and entitled to vote on the Plan. |
| **Class 10 – Warrant claims or interests** | ☒ Impaired<br>☐ Unimpaired | All Warrants will be cancelled, annulled, and extinguished on the Effective Date. To the extent that the Warrants are determined to give rise to a claim (including any claim arising from cancellation or rejection were the Warrants to be determined to be executory contracts), such claims are subordinated to the general unsecured claims by operation of 11 U.S.C. § 510(b) and shall not receive any distribution under this Plan. Holders of Warrants will not be entitled to receive or retain any property under the Plan, and pursuant to Section 1126(g) of the Bankruptcy Code, are deemed not to have accepted the Plan.<br><br>Class 10 is impaired, deemed to have rejected the Plan, and not entitled to vote. |
| **Class 11 – Allowed Equity Interest Holders of the Debtor** | ☒ Impaired<br>☐ Unimpaired | Each Allowed Equity Interest Holder in Debtor shall retain its equity securities; provided; however, that: (i) all preferred shares shall be converted to common shares on the Effective Date; and (ii) in exchange for such conversation to common stock, each holder of preferred shares shall receive a Subordinated Equity Note in the principal amount that the Equity Interest Holder originally invested in Debtor, which will be paid *pro rata* with the Subordinated SAFE Notes. See Article 8 for the definition of Subordinated Equity Note.<br><br>Class 11 is impaired and entitled to vote on the Plan. |

## Article 5: Allowance and Disallowance of Claims

| | |
|---|---|
| 5.01 **Disputed claim** | A "<u>Disputed Claim</u>" is a claim that has not been allowed or disallowed by a Final Order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor has filed an objection thereto; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated. Disputed Claims shall be provided for in the Disputed Claims Reserve in <u>Article 10, ¶ 5</u> pending the determination of their allowance of disallowance. |
| 5.02 **Delay of distribution on a disputed claim** | No distribution will be made on account of a Disputed Claim unless such claim is Allowed by Final Order. |
| 5.03 **Settlement of disputed claims** | After the Effective Date, the Reorganized Debtor will have the power and authority to settle and compromise a disputed claim without court approval. |

## Article 6: Provisions for Executory Contracts and Unexpired Leases

| | | |
|---|---|---|
| 6.01 | **Assumed executory contracts and unexpired leases** | The Debtor proposes to assume all executory contracts and unexpired leases as of the Effective Date except the executory contracts listed on **Exhibit 3**. With respect to all other executory contracts and unexpired leases not listed on **Exhibit 3**, Debtor will be deemed to have **accepted** those as of the Effective Date and asserts that no cure claims are owing for those proposed to be assumed herein. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this Section 6.01 must be filed no later than **30** days after the date of the entry of the order confirming this Plan, or it will be barred. The Confirmation Order will constitute an order of the Bankruptcy Court, approving the assumptions and rejections described herein pursuant to § 365 of the Bankruptcy Code, as of the Effective Date. |

## Article 7: Means for Implementation of the Plan

| | | |
|---|---|---|
| 7.01 | **Funding** | This Plan will be funded through cash flow generated from future operations of the Reorganized Debtor's business and, to the extent necessary, contributions by equity to ensure the payments contemplated by this Plan are timely made. |
| 7.02 | **Revesting of Assets** | On the Effective Date, all of Debtor's Assets shall be vested in the Reorganized Debtor free and clear of all liens, claims, and equity securities, expect as otherwise expressly provided in the Plan. |
| 7.03 | **No Corporate Action Required** | As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by this Plan; and (ii) the other matters provided for under or in furtherance of this Plan involving corporate action to be taken by or required of Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or officers of Debtor. |
| 7.04 | **By-laws & Governing Documents** | The bylaws and any other corporate governance documents of the Debtor shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code and shall include, among other things, a provision prohibiting the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code. |
| 7.05 | **No Governance Action** | As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases, and other agreements related to or contemplated by this Plan; and (ii) the other matters provided for under or in furtherance of this Plan involving corporate action to be taken by or required of the Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or managers of the Debtor. |

   **Article 8: General Provisions**

| | |
|---|---|
| **8.01 Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions: |
| **Allowed** | This term means, with reference to any claim: (a) any claim against the Debtor that has been listed in the Debtor's filed bankruptcy schedules, as such schedules may be amended from time to time in accordance with Fed. R. Bankr. P. 1009, as liquidated in amount, and not disputed or contingent and for which no contrary proof of claim has been filed; (b) any claim allowed (i) under the Plan, (ii) by Final Order; or (c) as to which a proof of claim has been timely filed by the Bar Date in a liquidated amount with the Bankruptcy Court, pursuant to the Bankruptcy Code or any order of the Bankruptcy Court, or has been filed with leave of the Bankruptcy Court after notice and a hearing, provided that no objection to the allowance of such claim or motion to expunge such claim has been filed by any party in interest before the deadline to object to confirmation of the Plan. |
| **Allowed Equity Interest Holder** | This term means a person or entity owning stock in the Debtor as of the May 31, 2024 that: (i) is allowed pursuant to this Plan; (ii) is not Disputed by the Debtor; or (iii) if Disputed, which stock ownership has been allowed in whole or in part by Final Order of the Bankruptcy Court.  Holders of SAFEs, and Warrants are not Allowed Equity Interest Holders. |
| **Allowed Equity Interest** | This term means stock in the Debtor as of the May 31, 2024 that: (i) is allowed pursuant to this Plan; (ii) is not Disputed by the Debtor; or (iii) if Disputed, which stock ownership has been allowed in whole or in part by Final Order of the Bankruptcy Court.  SAFEs and Warrants are not Allowed Equity Interests. |
| **Assets** | This term means all of the assets, property, interests, and effects, real and personal, tangible and intangible, wherever situated, of the Debtor, as they exist on the Effective Date.  After the Effective Date, Assets shall mean all assets, property, interests, and effects, real and personal, tangible and intangible, wherever situated, of the Reorganized Debtor. |
| **Bar Date** | This term means <u>May 31, 2024</u> for all creditors (except for governmental units) and is the date by which they are required to file proofs of claim, except with respect to claims that were scheduled by the Debtor in its filed bankruptcy schedules (as amended) as undisputed, non-contingent, and liquidated.  For governmental units, the bar date for their filing of claims is <u>July 24, 2024.</u> |
| **Final Order** | This term means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter as entered on the docket in the Debtor's Chapter 11 Case, or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal has expired (or otherwise been waived) or no appeal was been timely made, or as to which any appeal that has been taken that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed. |

| | |
|---|---|
| **Gratitude Railway Claims** | This term means the claims and interests arising from the: (i) Pigeonly, Inc. Revenue Loan Agreement dated March 9, 2022, by and between Gratitude Railroad Venture LLC and Debtor; (ii) Pigeonly, Inc. Revenue Loan Agreement dated November 7, 2022, by and between Gratitude Railroad Venture LLC and Debtor; and (iii) Warrant to Purchase Shares of Common Stock issued by Debtor to Gratitude Railroad Venture LLC. |
| **Plan Supplement** | This term means a supplement filed prior to solicitation attaching Plan implementation documents. |
| **Reorganized Debtor** | This term means Debtor as reorganized pursuant to this Plan after the Effective Date. |
| **SAFEs** | This term means each Simple Agreement for Future Equity executed by Debtor in favor of a SAFE Investor. |
| **SAFE Investor** | This term means a person or entity that exchanged cash for the right to obtain future shares of Debtor's capital stock subject to contingencies pursuant to a Simple Agreement for Future Equity executed by Debtor. |
| **SBA Loan Documents** | This term means the Loan Authorization and Agreement, Note (Secured Disaster Loans), and Security Agreement by and between the U.S. Small Business Administration and Debtor, dated January 13, 2022, memorializing a loan to Debtor in the amount of $500,000, and all amendments, supplements, and other documents related thereto. |
| **Subordinated Equity Note** | The unsecured promissory notes issued to Allowed Equity Interest Holders holding preferred stock in Debtor, which promissory notes shall: (i) be in the principal amount that each Allowed Equity Interest Holder invested in Debtor; (ii) not bear interest; (iii) be subordinated to repayment of all Allowed Secured Claims in Classes 2, 3, 4, and 5; (iv) contain a payment condition that all payments required by this Plan shall have been made in full prior to any payment being made on the note; and (v) provide for a capped *pro rata* net revenue share between the holders of the Subordinated Equity Notes and the Subordinated SAFE Notes. The Subordinated Equity Note will be included in the Plan Supplement. |
| **Subordinated SAFE Note** | The unsecured promissory notes issued to the SAFE Investors, which promissory notes shall: (i) be in the principal amount that each SAFE Investor invested in Debtor; (ii) not bear interest; (iii) be subordinated to repayment of all Allowed Secured Claims in Classes 2, 3, 4, and 5; (iv) contain a payment condition that all payments required by this Plan shall have been made in full prior to any payment being made on the note; and (v) provide for a capped *pro rata* net revenue share between the holders of the Subordinated SAFE Notes and the Subordinated Equity Notes. The Subordinated SAFE Note will be included in the Plan Supplement. |
| **U.S. Eagle Loan Documents** | This term means the Loan Agreement, Note, and Security Agreement by and between the U.S. Small Business Administration and Debtor, dated August 13, 2020, memorializing a loan to Debtor in the amount of $3,075,000, and all amendments, supplements, and other documents related thereto. |

| | | |
|---|---|---|
| | **Warrants** | This term means all claims and interests arising from or in connection with any warrants to purchase shares of Debtor's stock granted by Debtor prior to the Effective Date, solely excluding the Warrants included in the definition of Gratitude Railway Claims. |
| **8.02** | **Effective date** | The effective date of this Plan (the "Effective Date") is the first business day following the date that is fourteen (14) days after the entry of the Confirmation Order. If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| **8.03** | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| **8.04** | **Binding effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| **8.05** | **Captions** | The headings contained in this Plan are for convenience only and do not affect the meaning or interpretation of this Plan. |
| **8.06** | **Controlling effect** | Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Nevada govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |
| **8.07** | **Corporate governance** | Frederick Hutson shall be the Reorganized Debtor's President post-confirmation and the Board of Directors and all other officers and directors of Debtor shall remain in their respective roles for Reorganized Debtor post-Effective Date. |
| **8.08** | **Retention of Jurisdiction** | The Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case following the Effective Date for the following purposes, it being expressly intended that such retention of jurisdiction shall extend to any actions or proceedings commenced prior or subsequent to the Effective Date, whether by Debtor or the parties specified herein, including without limitation: To hear and determine any objections to the allowance of claims; To determine any and all applications for compensation for any professionals; To modify the Plan or to remedy any defect or omission or reconcile any inconsistency in the Confirmation Order to the extent authorized by the Bankruptcy Code; To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan or operation, implementation, enforcement and disbursements from the Disputed Claims Reserve; To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Bankruptcy Court entered in the Chapter 11 Case; To adjudicate all Claims to a security or ownership interest in any assets, or in any proceeds thereof; To determine all questions and disputes regarding recovery of and entitlement to any property of Debtor, or in any proceeds thereof; To determine issues and disputes concerning entitlement to distributions to be made under and pursuant to the Plan; To enter any order, including injunctions, necessary to enforce the title, rights and powers of Debtor's limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary or appropriate; To enter a discharge and final decree closing the Chapter 11 Case; To enforce the provisions of the Bar Date and the Plan; To make such orders as are necessary or appropriate to carry out the provisions of the Plan, |

including but not limited to orders interpreting, clarifying or enforcing the provisions thereof; enforce any claim or cause of action. If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising under, arising in or related to the Bankruptcy Case for any reason, the Plan shall not prohibit or limit the exercise of jurisdiction by any other court of competent jurisdiction.

## Article 9: Discharge

If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(l)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided § 1141(d)(6).

If the Debtor's Plan is confirmed under § 119l(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due as otherwise provided in § 1192 of the Bankruptcy Code.  The Debtor will not be discharged from any debt: (i) on which the last payment is due after the first three (3) years of the plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Fed. R. Bankr. P. 4007(c).

## Article 10: Other Provisions

10.1. <u>Prepayment</u>. The Debtor may prepay any Allowed claims under the Plan in advance and without penalty.

10.2. <u>Modified Treatment</u>. A holder of an Allowed claim in any Class may voluntarily agree to a less favorable treatment of its claim than is as set forth in the Plan; provided, however, that such agreement must be in writing and signed by both the Debtor or Reorganized Debtor, as applicable, and that party.

10.3. <u>Interest Rate</u>. Except as expressly set forth in Article 3, all interest to be paid under the Plan shall be paid at the Federal Judgment Rate pursuant to 28 U.S.C. § 1961(a) in effect as of the Petition Date, or such other amount as the Bankruptcy Court may order at the confirmation hearing on the Plan.

10.4. <u>Disallowance of Claims Not Allowed and Tardy Proofs of Claim.</u> The occurrence of the Effective Date shall operate to disallow and expunge any claims of any creditor who received or had actual notice of the Chapter 11 Case and that: (a) were not listed on the Debtor's filed bankruptcy schedules and for which no proof of claim was filed on or prior to the Bar Date; (b) were listed on the Debtor's bankruptcy schedules as disputed, contingent or unliquidated, and for which no proof of claim was filed on or prior to the Bar Date; (c) are the subject of a proof of claim for a pre-petition claim, but which proof of claim was filed after the Bar Date.

10.5. <u>Disputed Claims Reserve</u>.

(a) Creation of Disputed Claims Reserve.

From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, or Allowed or disallowed by Final Order, the Reorganized Debtor shall establish, for the benefit of each holder of a Disputed Claim, the Disputed Claims Reserve consisting of cash, and any income attributable thereto, in an amount equal to the *pro rata* share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, or (ii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtor.

For the avoidance of doubt, any cash retained and held for the benefit of a holder of a Disputed Claim as part of the Disputed Claims Reserve shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in cash in the event the Disputed Claim ultimately becomes an Allowed Claim. Cash held in the Disputed Claims Reserve (including any earnings that have accrued on such cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Reorganized Debtor for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.

Any cash shall be either (x) held by the Reorganized Debtor in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days.  No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

This cash shall be held in a separate, segregated bank account, independent of any and all other generating operating funds of the Reorganized Debtor. Cash held in the Disputed Claims Reserve will (i) be deposited in an interest-bearing account and held in trust pending distribution by the Reorganized Debtor for the benefit of holders of Allowed Claims, (ii) be accounted for separately and (iii) not constitute property of the Reorganized Debtor.

    (b) Distributions After Allowance of Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the Reorganized Debtor shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan. Such distribution, if any, shall be made as soon as reasonably practicable after the date that the order or judgment allowing such Disputed Claim becomes a Final Order, but in no event more than thirty (30) days thereafter.

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse first to the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and second, to the Reorganized Debtor.

    (c) Distributions After Disallowance of Disputed Claims

If a Disputed Claim is disallowed, in whole or in part, by a Final Order, then the Reorganized Debtor shall distribute the cash held in the Disputed Claims Reserve back to itself, but in the event other Allowed claims remain unpaid under the Plan, then such funds so returned back to the Reorganized Debtor from the Disputed Claims Reserve shall be used to satisfy other Allowed claims under the Plan.

10.06.  <u>Elimination of Vacant Classes.</u>  Any class of claims that is not occupied as of the date of the commencement of the confirmation hearing by an Allowed claim shall be deemed eliminated.

10.7.  <u>Cure Claims.</u>  Any party to an executory contract or unexpired lease who asserts a cure amount must file and serve an objection to the lack of any designated cure amount by no later than the deadline set by the Bankruptcy Court for filing objections to the Plan. Failure to file and serve a timely objection shall be deemed consent that the executory contract may be assumed without a cure payment.

10.8.  <u>Plan Distributions.</u>  The Reorganized Debtor shall make all payments required under the Plan to creditors, and shall be entitled to offset any postage and mailing costs against any distributions made.

10.9.  <u>Litigation Claims.</u>  Debtor reserves any and all litigation claims against any and all creditor or party in interest, including without limitation any potential litigation claims listed in its bankruptcy schedules, as well as any pending appeals related to any claims.  All such litigation claims and appeals shall revest in the Reorganized Debtor immediately on the Plan's Effective Date, and the Reorganized Debtor shall be entitled to proceed with respect to litigation claims and appeals in its sole and absolute discretion, subject only to the other terms and conditions of the Plan.

10.10. <u>Default Under Plan; Remedies.</u>  The confirmed Plan is binding on every creditor whose claims are provided for in the Plan and every equity security holder whose equity securities are provided for in the Plan. Therefore, even though the automatic stay terminates on the Effective Date with respect to claims, no creditor or equity security holder may take any action to enforce either the pre-confirmation obligation or the obligation due under the Plan, including continuing with any pre-petition litigations, so long as the Reorganized Debtor is not in Material Default (as hereinafter defined) under the Plan. In the event the Reorganized Debtor fails to timely perform any of the obligations set forth in the Plan from and after the Effective Date, the applicable creditor or party-in-interest shall provide written notice thereof and send via email to all of the following: the Reorganized Debtor's president, Frederick Hutson (frederick@pigeon.ly) and to the Debtor's bankruptcy counsel, Talitha Gray Kozlowski, Esq. of Garman Turner Gordon LLP (tgray@gtg.legal), of the specific default in writing in accordance with the notice provisions herein. Such notice shall be ineffective unless transmitted via email to both of the foregoing persons. If the Reorganized Debtor fails within thirty (30) calendar days of the date of the email of the notice of default either: (i) to cure the default; (ii) to obtain from the Bankruptcy Court an extension of time to cure the default, which shall be given for cause shown if the cure reasonably requires more than thirty (30) days to cure and the Reorganized Debtor initiates reasonable steps to begin such cure and completes all reasonable and necessary steps to cure sufficient to produce compliance as soon as reasonably practical; or (iii) to obtain from the Bankruptcy Court a determination that no default occurred, then the Reorganized Debtor is in "<u>Material Default</u>" under the Plan to all the members of the affected Class.  If the Reorganized Debtor fails to timely cure the default as provided above, the applicable creditor shall be free to pursue any and all rights and remedies it may have under the contract(s) between the parties and/or applicable law, as modified by this Plan, and without further action by or proceedings before the Bankruptcy Court.  Upon Material Default, any member of a class affected by the default: (i) may file and serve a motion to dismiss the case or to convert the case to chapter 7; or (ii) without further order of the Court, has relief

from automatic stay and the Confirmation Order, to the extent necessary, and may pursue its lawful remedies to enforce and collect the obligations owing to it under the Plan, and only what is owed to it under the Plan, in any applicable court of appropriate jurisdiction.

10.11. <u>Exculpation</u>. Neither the Debtor nor any of its officers, directors, shareholders, managers, members, employees, agents, attorneys, or other professionals (collectively, the "<u>Exculpated Parties</u>") shall have or incur any liability to any holder of a claim against the Debtor, Reorganized Debtor, or any other party-in-interest, for any act, omission, transaction, or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of the Plan, or the consummation of the Plan, except and solely to the extent such liability is based on fraud, gross negligence, or willful misconduct. The Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to any of their duties and responsibilities under the Plan or in the context of the Chapter 11 Case. No Holder of a claim against the Debtor, Reorganized Debtor, or any other party-in-interest, including their respective representatives, shall have any right of action against the Exculpated Parties, for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation or administration of the Plan, except to the extent arising from fraud, gross negligence or willful misconduct.

10.12. <u>Injunction</u>. Upon entry of the Confirmation Order, and except as expressly set forth in this Plan, all holders of claims and parties in interest shall be permanently enjoined on and after the Effective Date, from taking any actions to interfere with the implementation and consummation of the Plan. Except as expressly provided in the Plan or the Confirmation Order, all entities who hold claims against the Debtor, inclusive of its specific cells and/or any property of those specific cells, are and shall be permanently enjoined, on and after the Effective Date, with respect to any claims, from directly or indirectly (a) commencing, conducting, or continuing in any manner, any suit, action or other proceeding of any kind against or affecting the Debtor, or the property of the Debtor, (b) enforcing, levying, attaching, collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor, (c) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (d) asserting any right of setoff against any obligation due to the Debtor or against property of interests of property of the Debtor, except to the limited extent permitted under §§ 553 and 1141 of the bankruptcy Code, and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (a)-(e) above against the Reorganized Debtor under this Plan as well.

10.13. <u>Governing Law</u>. Except to the extent that the Bankruptcy Code is applicable or as provided in the Plan, the rights and obligations of the Debtor, Reorganized Debtor, and any other person arising under the Plan shall be governed by Nevada law.

10.14. <u>Entire Agreement</u>. This Plan, its exhibits, and the Plan Supplement set forth the entire agreement of the parties hereto relating to the subject matter hereof and supersede all prior discussions and documents.  No party hereto shall be bound by or may rely on any terms, conditions, definitions, understandings, or representations with respect to the subject matter hereof other than as is expressly provided herein or in the Confirmation Order approving the Plan.

Respectfully submitted,
GARMAN TURNER GORDON LLP

By: /s/ Talitha Gray Kozlowski
    TALITHA GRAY KOZLOWSKI, ESQ.
    TERESA M. PILATOWICZ, ESQ.
    7251 Amigo Street, Suite 210
    Las Vegas, Nevada 89119
    *Attorneys for Pigeonly, Inc. dba Fotopigeon*

By: /s/ Frederick Hutson
    Frederick Hutson, President


Exhibit 1:  Liquidation Analysis
Exhibit 2: *Pro Forma* Three-Year Disposable Income Projections
Exhibit 3: List of Executory Contracts and Unexpired Leases Proposed to be Rejected