MICHAEL B. WIXOM, ESQ.
Nevada Bar No. 2812
KARL L. NIELSON, ESQ.
Nevada Bar No. 5082
**SMITH LARSEN & WIXOM**                    E-Filed on:  October 29, 2024
1935 Village Center Circle
Las Vegas, Nevada 89134
Tel: (702) 252-5002
Fax: (702) 252-5006
Email:  mbw@slwlaw.com
           kln@slwlaw.com

C. KEVIN KOBBE, ESQ.
Admission *pro hac vice* pending
**DLA PIPER LLP (US)**
650 South Exeter Street, Suite 1100
Baltimore, Maryland 21202
Tel: (410) 580-4189
Fax: (410) 580-3189
Email: kevin.kobbe@us.dlapiper.com

*Counsel for Itria Ventures LLC, a Delaware limited liability company,*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>PIGEONLY INC. d/b/a FOTOPIGEON,<br><br>       Debtor. | Case No. 24-10355-nmc<br><br>Chapter 11 |
| PIGEONLY INC. d/b/a FOTOPIGEON,<br><br>       Plaintiff,<br><br>v.<br><br>ITRIA VENTURES LLC, a Delaware limited liability company,<br><br>       Defendant. | Adv. Proc. No. 24-01118-nmc<br><br>**AMENDED DEFENDANT'S MOTION TO COMPEL ARBITRATION AND FOR STAY OF PROCEEDINGS OR, IN THE ALTERNATIVE, TO DISMISS**<br><br>Hearing Date: November 26, 2024<br>Hearing Time: 9:30 a.m. |

The Defendant, Itria Ventures LLC ("**Itria**"), by its undersigned counsel, moves to compel

arbitration of the claims asserted in Counts 1, 2, 3, 4 and 8 of the Complaint (the "**Complaint**")

[Adv. Proc. Dkt. No. 1] filed by the Plaintiff, Pigeonly Inc. d/b/a Fotopigeon (the "**Debtor**"), and

to stay this adversary proceeding pending completion of the arbitration. In the alternative, Itria moves to dismiss all claims asserted in the Complaint. In support of this motion, Itria relies upon the below Memorandum of Points and Authorities

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In April 2022, Itria and the Debtor entered into an agreement under which Itria advanced funds to the Debtor to purchase receivables. The Debtor – after having requested and received the benefit of the funding provided by Itria, and after having defaulted on its obligations – now complains that the parties' agreement is a disguised loan agreement that is void under New York usury law.

The parties' agreement, which is governed by New York law, is precisely the type of agreement that has been upheld by New York courts in scores of cases. Under the agreement, the Debtor sold a fixed amount of its receivables to Itria and agreed to remit a percentage of its collections over an open-ended period with the right to request a monthly true-up to conform the amount of the remittances to the amount of actual collections. Unlike a loan agreement, the parties' agreement does not provide for the payment of principal or interest, nor does it provide for a fixed term. Further, unlike a loan agreement, the parties' agreement does not impose an absolute obligation on the Debtor to make payments. Instead, it provides that Itria's right to receive payments is contingent on the Debtor's collection of receivables. If the Debtor is unable to collect sufficient receivables to remit the full amount purchased by Itria, and even if the Debtor files bankruptcy, it is not considered to be in default if it has otherwise complied with its obligations.

The parties' agreement also includes a mandatory arbitration provision which covers "all disputes and claims arising out of or relating to" the agreement. The claims asserted in Counts 1, 2, 3, 4 and 8 of the Complaint – including the Debtor's claim for a declaratory judgment that the parties' agreement is usurious, the resolution of which will likely impact all of the Debtor's other claims – are non-core claims based on state law. The Court should send these claims to arbitration and stay this adversary proceeding pending completion of the arbitration. If the Court declines to

905680341.1

1  compel arbitration, it should dismiss all claims asserted in the Complaint for the reasons set forth

2  herein.

3  ### **STATEMENT OF FACTS[1]**

4  #### **The RSA**

5          1.      Itria and the Debtor are parties to a Receivables Sale Agreement dated April 28,

6  2022 (the "**RSA**").  Complaint at ¶ 17 and Ex. 1.

7          2.      Under the terms of the RSA, Itria (defined in the RSA as the "Purchaser") agreed to

8  purchase, and the Debtor (defined in the RSA as the "Merchant") agreed to sell, "Receivables,

9  which are defined as follows:

10             "**Receivables**" means any and all: (i) funds that Merchant receives from its
               customers using credit cards, charge cards, debit cards, prepaid cards, benefit
11             cards, or similar cards to purchase Merchant's products and/or services
               (including without limitation any such funds that are processed by Merchant's
12             card processor(s)); (ii) funds that Merchant receives from its customers of cash,
               checks, money orders or other electronic transfers or other forms of payment to
13             purchase Merchant's products and/or services; (iii) accounts, future accounts,
               contract rights, choses in action and any other rights to payment; and (iv)
14             insurance proceeds received by Merchant (up to the full Amount Sold less total
               remittances under this Agreement) in connection with any of the foregoing, in
15             each case as applicable.

16  RSA at p. 1 and § 2(c).

17          3.      In particular, Itria advanced $73,000.00 to the Debtor to purchase $93,750.00 of

18  Receivables, and the Debtor agreed to remit to Itria an agreed-upon percentage of its Receivables

19  collections in weekly installments.  Complaint at ¶ 17; RSA at p. 1 and §§ 2 and 4.

20          4.      The RSA provides that the purchase and sale of Receivables does not constitute a

21  loan transaction:

22             By signing this Agreement, you confirm that the purchase and sale of
               Receivables contemplated by this Agreement does not constitute a loan
23             transaction.  Because the transactions under this Agreement are a sale and not a
               loan, there is no term, interest rate or any annual percentage rate (APR).  In

25  _____

26  [1] The facts in this motion are based on allegations of the Complaint and the terms of RSA, a copy of
    which is attached as Exhibit 1 to the Complaint.  In assessing a motion to dismiss, courts may consider
27  exhibits to the complaint, documents incorporated by reference in the complaint, and matters subject
    to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014).

28

- 3 -

> addition, because this transaction is not a loan, Purchaser has assumed the risk
> that Receivables may not be available for remittance to Merchant.

RSA at § 1.

5.      In addition, the RSA provides that the purchase and sale of Receivables is an irrevocable, unconditional and absolute sale to Itria of all of the Debtor's right, title and interest in and to the Receivables sold:

> (a) *Title to Receivables*. In exchange for the Purchase Price, you hereby irrevocably, unconditionally and absolutely sell, assign and transfer to Purchaser all (100%) of Merchant's right, title and interest (whether legal, equitable or beneficial) in and to the Amount Sold out of Merchant's Receivables, on the terms and conditions specified herein. The purchase and sale of Receivables under this Agreement shall take place in New York. As of the Effective Date, the purchased Receivables shall be absolutely and unconditionally transferred to, owned by, controlled by, and vested solely in Purchaser, subject to the terms and conditions hereof.

RSA at § 2(a).

6.      The RSA is governed by New York law.  RSA at § 15(a).

**Remittance of Receivables Collections**

7.      Under the terms of the RSA, the Debtor was required to remit to Itria 1.29% of its Receivables collections every week.  Because of the administrative inconvenience of calculating the agreed-upon percentage of the Debtor's actual weekly Receivables collections, the parties agreed that the Debtor would make a weekly remittance to Itria in the amount of $1,953.13, which amount represented an estimate of the average agreed-upon percentage of the Debtor's weekly Receivables collections:

> The "**Purchased Percentage**" is the percentage of Receivables that Purchaser will receive on the periodic basis specified on the front page of the Agreement, until the Amount Sold (plus any additional fees and charges incurred under this Agreement) has been fully delivered to Purchaser. The "**Periodic Amount**" is the amount the parties have (i) estimated as the average periodic Purchased Percentage amount and (ii) agreed that, for administrative convenience . . . , you will remit to Purchaser on the periodic basis specified on the front page of the Agreement, subject to reconciliation (True-Up) against your actual Receivables, as set forth in <u>Section 5</u>.

RSA at p. 1 and § 2(b).

905680341.1

8.      If the Debtor believed that the amount of the agreed-upon percentage of its actual weekly Receivables collections was lower than the $1,953.13 weekly amount that it was required to remit to Itria, it had the right to request a monthly "true-up" or reconciliation:

> **5. Monthly True-Up.** (a) *Merchant Right to Have Reconciliation*. You have the right to receive a reconciliation (a "**True-Up**") of remittances of your Periodic Amount remittances made in the period you designate not to exceed 60 days prior to the date of your True-Up request (such period, a "**Prior Period**") against the Purchased Percentage of your actual collected Receivables received for that period. You also have the right to extend this True-Up going forward as provided in paragraph (c) below. . . **This Section 5 supplements the Purchase and Sale Terms set out on the front page of this Agreement and in Section 2(b), and provides important rights to Merchant.**

RSA at § 5(a) (emphasis in original).

9.      If the true-up resulted in a finding that the Debtor had remitted a percentage of its Receivables greater than the required agreed-upon percentage during the true-up period, the Debtor would be entitled to an appropriate credit.  RSA at § 5(c).

10.     The RSA provides that Itria's "right to receive remittances under this Agreement is contingent on [the Debtor's] receipt of Receivables" and that Itria "has assumed the risk that Receivables may not be available for remittance[.]"  RSA at § 1.

11.     The failure of the Debtor to remit to Itria the full amount of the Receivables purchased does not constitute a material breach of the RSA if the Debtor has otherwise complied with its obligations under the RSA, as evidenced by the following language:

> **Limitations on Material Breach.** Notwithstanding any other provision of this Agreement, (i) if the aggregate Receivables remitted to Purchaser pursuant to this Agreement are less than the stated Amount Sold despite Merchant's best efforts to operate its business in compliance with this Agreement in good faith, and Merchant has not violated any other provision of this Agreement, such diminution of Receivables shall not of itself be deemed a Material Breach.

RSA at § 7.B(i).

12.     Further, a bankruptcy filing by the Debtor does not constitute a material breach of the RSA.  RSA at § 7.B(ii).

**Payments Made by the Debtor to Itria**

13.    The Debtor alleges that, after entering into the RSA, it paid "at least $65,000" to Itria, which is less than the $73,000 that the Debtor acknowledges it "actually received" from Itria. Complaint at ¶¶ 19 and 78.

14.    The Debtor alleges that Itria "received the sum of $1,953.13 on each of" 19 dates between May 16, 2022 and December 28, 2023.  Complaint at ¶ 79.  The total of these 19 payments is $37,109.47.

**Mandatory Arbitration**

15.    The RSA includes the following arbitration provision:

> (g) *Arbitration*. Except as expressly otherwise provided herein, ***each party agrees to confidential arbitration of all disputes and claims arising out of or relating to this Agreement, including issues relating to the arbitrability of any dispute or claim*** (collectively, "**claims**") at the request of the other party. If a party seeks to have a dispute settled by arbitration, that party must first send to the other party, by certified mail, a written Notice of Intent to Arbitrate (the "**Notice**"). If the parties do not reach an agreement to resolve the claim within thirty (30) days after the Notice is received, Purchaser and Merchant agree that the claim will be resolved by a final and binding arbitration proceeding with JAMS, Inc. ("**JAMS**") in New York County, State of New York, under the Optional Expedited Arbitration Procedures then in effect. The parties agree that, except as otherwise expressly required by JAMS rules, (i) the party filing arbitration shall pay all JAMS filing fees and reasonable administrative fees; (ii) thereafter, each party shall bear its own arbitration costs and fees, including witness fees and attorneys' fees; and (iii) each party shall bear an equal share of the arbitrator's fees; provided, if the arbitrator finds that either the substance of the claims of any party or the relief sought by any party is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the arbitrator shall award the other party all of its costs and fees of the arbitration, including witness and reasonable attorneys' fees. Purchaser and Merchant agree that, except as expressly otherwise provided herein, (i) ***arbitration is the required and exclusive forum for the resolution of all claims*** and (ii) to the fullest extent permitted by law, Purchaser and Merchant are each permanently giving up their right to a jury trial in any forum and the right to a judicial forum for the resolution of any and all claims. . . .

RSA at § 15(g) (emphasis added).

**The Bankruptcy Case and the Adversary Proceeding**

16.    On January 26, 2024, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Complaint at ¶ 16.

905680341.1

17.     On September 25, 2024, the Debtor filed this adversary proceeding against Itria. The Complaint includes the following counts:

Count 1:   Fraud
Count 2:   Negligent Misrepresentation
Count 3:   Deceptive Business Practices (New York General Business Law § 349)
Count 4:   Breach of Fiduciary Duties
Count 5:   Fraudulent Transfers (11 U.S.C. § 548)
Count 6:   Fraudulent Transfers (New York Debtor and Creditor Law § 273)
Count 7:   Recovery of Fees (11 U.S.C. §§ 550 and 551)
Count 8:   Declaratory Judgment

## LEGAL ANALYSIS AND ARGUMENT

### I.     The Court Should Compel Arbitration

The Federal Arbitration Act (the "**FAA**"), 9 U.S.C. §§ 1, *et seq.*, establishes a "liberal federal policy favoring arbitration agreements[.]"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  The Supreme Court has repeatedly reaffirmed this policy, which requires that courts "rigorously enforce" arbitration agreements.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985).  *See also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("The principal purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms.").  Because of the strong federal policy favoring arbitration, the party opposing arbitration carries the burden of demonstrating why arbitration should not be ordered.  *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).

Consistent with the policy and purpose of the FAA, Section 2 of the FAA provides that arbitration agreements are "valid, irrevocable, and enforceable" as written; Section 3 requires courts to stay litigation of claims that are subject to an arbitration agreement "until such arbitration has been had in accordance with the terms of the agreement"; and Section 4 requires courts to compel arbitration "in accordance with the terms of the agreement" upon motion of a party to the agreement.  9 U.S.C. §§ 2-4.

In *In re Thorpe Insulation Co., Inc.*, 671 F.3d 1011 (9th Cir. 2012), the Ninth Circuit considered the enforceability of an arbitration provision in the bankruptcy context and the tension that exists between the policies underlying the FAA and the Bankruptcy Code.  In doing so, the Ninth Circuit concluded that, "[i]n non-core proceedings, the bankruptcy court generally does not have discretion

to deny enforcement of a valid prepetition arbitration agreement.  In core proceedings, by contrast, the bankruptcy court, at least when it sees a conflict with bankruptcy law, has discretion to deny enforcement of an arbitration agreement." *Thorpe*, 671 F.3d at 1021 (internal citations omitted).

Here, there is no question that the parties have a valid agreement to arbitrate that encompasses the claims asserted by Debtor in Counts 1, 2, 3, 4 and 8 of the Complaint.  Further, there is no question that the claims asserted by the Debtor in Counts 1, 2, 3, 4 and 8 of the Complaint are non-core claims because they are based on state law and do not invoke any substantive right under the Bankruptcy Code.  The claims exist independent of the Debtor's bankruptcy case and could have been asserted by the Debtor even if no bankruptcy had been filed.  *See In re Horstman*, 2018 WL 6219840, at*3 (C.D. Cal. Oct. 1, 2018) ("Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered 'non-core.'") (quoting *Security Farms v. Int'l Brotherhood of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997)).

Because the claims asserted in Counts 1, 2, 3, 4 and 8 are non-core, the Court has no discretion to decline to compel arbitration.  *Thorpe*, 671 F.3d at 1021; *Campos v. Bluestem Brands, Inc.*, 2016 WL 297429, at *10 (D. Ore. Jan. 22, 2016) (noting that, under *Thorpe*, "[c]ourts do not have discretion to decline to compel arbitration of non-core proceedings when the parties have formed a valid arbitration agreement").

Further, to the extent the Court determines that it has discretion in this matter, it still can only decline enforcement of the parties' arbitration agreement upon a showing that arbitration would conflict with the underlying purposes of the Bankruptcy Code.  *Thorpe*, 671 F.3d at 1021 (holding that, "even in a core proceeding, the *McMahon* standard must be met – that is, a bankruptcy court has discretion to decline to enforce an otherwise applicable arbitration provision only if arbitration would conflict with the underlying purposes of the Bankruptcy Code").

To the extent the Court determines that it has discretion in this matter, it should exercise its discretion to compel arbitration for numerous reasons:

First, as discussed above, resolution of the claims in Counts 1, 2, 3, 4 and 8 of the Complaint involves the application of state law rather than bankruptcy law.  Thus, resolution of the claims does not require the special expertise of this Court.

- 8 -

Second, unlike many cases in which the party opposing arbitration is a consumer, the Debtor is a commercial party. As such, the Debtor should be held to the terms of the arbitration provision, by which the Debtor agreed to arbitrate "all disputes and claims arising out of or relating to" the RSA. The Debtor, after having received the significant benefit of the funding provided by Itria under the RSA, should not be permitted to disown this key provision of the RSA.

Third, the Debtor and Itria have agreed that the arbitration is to be conducted by JAMS, the world's largest provider of alternative dispute resolution services. The JAMS panel includes numerous retired judges and other highly qualified arbitrators, and there is no question that the arbitration would be conducted in a professional manner by an arbitrator with appropriate experience and subject matter expertise.

Fourth, an arbitration could be concluded in a prompt and efficient manner and would not in any way interfere with the administration of the Debtor's bankruptcy case, which is now in the post-confirmation stage. Significantly, the arbitration provision of the RSA provides that the arbitration is to be conducted under the JAMS Optional Expedited Arbitration Procedures, which will help save time and expense. Further, to the extent delay is a concern, the Court can require the parties to provide periodic reports regarding the progress of the arbitration and/or impose a deadline for the parties to complete the arbitration.

Fifth, the Debtor may argue that it would be more convenient to centralize its dispute with Itria before this Court. The need for centralization, however, does not override the strong policy favoring enforcement of arbitration agreements. *See Envisage Dev't Partners, LLC v. Patch of Land Lending, LLC*, 2017 WL 4551575, at *7 (N.D. Cal. Oct. 11, 2017) ("It is indisputable that a goal of the Bankruptcy Code is to centralize disputes, but [the party opposing arbitration] would treat that goal as an exception that swallows the rule. In every case, litigation would be simpler and the bankruptcy court could maintain greater control if it denied a motion to compel arbitration and kept all disputes to itself. But the goal of centralizing disputes does not alone override the FAA[.]") (citing *Thorpe*, 671 F.3d at 1021)).

Given the circumstances, arbitration of the claims in Counts 1, 2, 3, 4 and 8 of the Complaint would assist the parties in orderly and efficiently conducting this litigation, and it would not in any

way conflict with the underlying purposes of the Bankruptcy Code. By exercising its discretion to compel arbitration, the Court can effectively balance the policies underlying both the FAA and the Bankruptcy Code.

**II.    The Court Should Stay Proceedings Pending Completion of the Arbitration**

Section 3 of the FAA provides in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]

9 U.S.C. § 3. *See also Moses H. Cone Mem'l Hosp.,* 460 U.S. at 22 (the FAA "provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration . . . and an affirmative order to engage in arbitration"); *Tillman v. Tillman,* 825 F.3d 1069, 1075 (9th Cir. 2016) (Section 3 of the FAA "provides that district courts must stay pending proceedings on issues subject to arbitration until such arbitration has been had").

Here, the Court should stay this adversary proceeding pending completion of the arbitration. In addition to being required under Section 3 of the FAA, a stay is warranted in the interests of efficiency and judicial economy. Once the arbitration has been completed, the parties will be able to return to this Court and resume litigation of the bankruptcy-specific claims in the Complaint.

**III.    In the Alternative, the Court Should Dismiss All Counts of the Complaint**

If the Court declines to exercise its discretion to compel arbitration, it should dismiss all counts of the Complaint.

**A.    Standard for Motion to Dismiss**

Itria moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. To survive a Rule 12(b) motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 667 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Although the court must accept as true well-pleaded factual allegations, it is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 558 (quoting 5 Wright & Miller § 1216 at 233-34).  "[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *PBGC v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2nd Cir. 2013) (emphasis in original).

**B.    The Declaratory Judgment Claim Should be Dismissed**

The Debtor asserts that the RSA is a disguised loan agreement rather than an agreement for the purchase and sale of receivables, and in Count 8 of the Complaint seeks a declaratory judgment that the RSA is usurious, illegal and void.  Complaint at ¶ 97.  Because other claims in the Complaint are based on the Debtor's assertion that the RSA is a usurious loan agreement, the declaratory judgment claim is addressed here first.

**1.    The Debtor Cannot Assert an Affirmative Claim for Declaratory Judgment Based on New York Usury Law**

The Debtor's declaratory judgment claim fails because, under settled New York law, business entities cannot sue for affirmative relief based on alleged violations of usury law.

New York has both a civil usury statute (N.Y. Gen. Oblig. Law § 5-501, *et seq.*) and a criminal usury statute (N.Y. Penal Law §§ 190.40 and 190.42).  As a preliminary matter, business entities are barred from using the civil usury statute.  *See* N.Y. Gen. Oblig. Law § 5-521(1) ("No corporation shall hereafter interpose the defense of usury in any action.").  Thus, the Debtor has no right to assert any violation of New York's civil usury statute.

Further, New York courts have repeatedly held that usury cannot be asserted as an affirmative claim; rather, it can only be asserted as a defense. *See, e.g., Paycation Travel, Inc. v. Global Merch.*

905680341.1

*Cash, Inc.*, 141 N.Y.S.3d 319, 320 (App. Div. 2021) ("Gen. Oblig. Law § 5-521 bars a corporation such as the plaintiff from asserting usury in any action, except in the case of criminal usury as defined in Penal Law § 190.40, and then only as a defense to an action to recover repayment of a loan, and not as a basis for a cause of action asserted by the corporation for affirmative relief."); *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 122 N.Y.S.3d 309, 313 (App. Div. 2020) ("Although the defendants may assert criminal usury as an affirmative defense, they may not assert criminal usury as the basis for a counterclaim."); *Scantek Medical, Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) (granting motion to dismiss declaratory judgment claim based on usury, and noting that, "[a]lthough corporations like plaintiff can assert criminal usury as a defense, they cannot bring civil claims under the criminal statute")

In *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, 2022 WL 2719751 (S.D.N.Y. Jan. 31, 2022), the court granted a motion to dismiss a complaint seeking a declaratory judgment that a merchant cash agreement was void on grounds of usury.  In doing so, the court noted that "Plaintiffs' argument that 'criminal usury is generally plead as an affirmative defense' but that '[c]ourts have found that a claim for declaratory judgment on a usurious loan is proper' finds no basis in New York law."  2022 WL 2719751, at *3, n. 4.

### 2.    The RSA is Not a Loan Agreement

The Debtor's assertion that the RSA is a usurious loan agreement is wrong as a matter of law.  Based on overwhelming authority, the RSA is not a loan agreement.  To the contrary, the RSA is exactly what is says it is: an agreement for the purchase and sale of receivables to which the law of usury does not apply.

"Purchases and sales of future receivables and sales proceeds are common commercial transactions expressly contemplated by the Uniform Commercial Code." *IBIS Capital Group, LLC v Four Paws Orlando LLC*, 2017 WL 1065071, at *3 (N.Y. Sup. Ct. Mar. 10, 2017) (dismissing counterclaim seeking to avoid agreement as usurious on grounds that the parties entered into a purchase and sale agreement rather than a loan agreement) (collecting cases).  "Receivables purchasing is an accepted form of business transaction, and is not a loan." *Retail Capital, LLC v. Spice Intentions Inc.*, 2017 WL 123374, at *3 (N.Y. Sup. Ct. Jan. 3, 2017.)

- 12 -

905680341.1

In recent years, numerous federal and state courts in New York have addressed the issue of whether agreements for the sale of receivables constitute loan agreements, and these courts have repeatedly held that they do not. *See, e.g., Colonial Funding Network, Inc. v. Epazz, Inc.*, 252 F.Supp.3d 274, 279-84 (S.D.N.Y. 2017) (granting motion to dismiss on grounds that the parties' agreement for the sale of receivables was not a loan); *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 57 N.Y.S. 3d 625, 632-34 (N.Y. Sup. Ct. 2017) (granting motion to dismiss on grounds that agreements for the sale of future receivables "cannot be considered loans, as a matter of law"); *Professional Merchant Advance Capital, LLC v. Your Trading Room, LLC*, 2012 N.Y. Misc. LEXIS 6757 (N.Y. Sup. Ct. 2012) (rejecting defendant's argument that plaintiff made a loan because the parties' agreement was "an agreement to purchase future receivables for a lump sum discounted purchase price payable in advance by the plaintiff in exchange for a contingent return").

The critical consideration in these decisions was whether repayment was absolute or contingent. If repayment is contingent, the transaction will not be viewed as a loan and, absent a loan, there is no basis for a claim of usury. *See Feinberg v. Old Vestal Rd. Assoc.*, 157 A.D.2d 1002, 1003 (3d Dept. 1990) ("The rudimentary element of usury is the existence of a loan or forbearance of money."); *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (N.Y. Sup. Ct. 1992) ("If the transaction is not a loan, 'there can be no usury, however unconscionable the contract may be.'") (quoting *Orvis v. Curtiss*, 157 N.Y. 657, 661 (1899)); *Transmedia Rest. Co. v. 33 East 61st St. Rest. Corp.*, 710 N.Y.S.2d 756, 760 (N.Y. Sup. Ct. 2000) ("[T]here can be no usury unless the principal sum advanced is repayable absolutely.").

In the *IBIS Capital* and *K9 Bytes* cases cited above, the courts identified three factors that should be considered by courts in determining whether repayment is contingent or absolute:

> First, whether the obligation of the merchant to make a fixed installment remittance is subject to an express reconciliation provision, under which the merchant may ensure that it is actually paying the agreed upon percentage of its actual collections;

> Second, whether the agreement has an indefinite term, designed to ensure the contingent nature of each remittance; and

> Third, whether the funding entity has no greater recourse against the merchant in the event of a bankruptcy filing.

- 13 -

905680341.1

*IBIS Capital*, 2017 WL 1065071, at *3-4; *K9 Bytes*, 57 N.Y.S. 3d at 632-33. These factors have been applied in numerous cases and recently have been endorsed by a New York appellate court in *Principis Capital, LLC v. I Do, Inc*., 201 A.D.3d 752, 754 (2d Dept. 2022) (holding that agreement for sale of future receivables was not a loan agreement, and dismissing defendant's counterclaims and affirmative defenses based on usury law). *See also Streamlined Consultants*, 2022 WL 2719751, at *5 (granting motion to dismiss and stating that "the Court joins an ever-growing group of courts that have held that nearly identical agreements" are not loan agreements).

All three factors are present in the case of the RSA at issue here.

<u>First</u>, the RSA includes a comprehensive reconciliation provision under which the Debtor had the right to request a monthly reconciliation to determine whether the weekly remittance amount under the RSA was consistent with the agreed-upon percentage of its weekly Receivables collections. In the event of an overpayment, Itria was required under the RSA to credit amounts remitted by the Debtor in excess of the agreed-upon percentage. RSA at § 5.

<u>Second</u>, the RSA does not have a definite term, and in fact expressly states that "[b]ecause the transactions under this Agreement are a sale and not a loan, ***there is no term***, interest rate or any annual percentage rate (APR)." RSA at § 1 (emphasis added). The absence of a definite term "is consistent with the contingent nature of each and every collection of future sales proceeds under the contract." *IBIS Capital*, 2017 WL 1065071, at *5-6 (observing that "neither party could have known when the Agreement might end because [the seller's] collection of sales proceeds was wholly contingent upon the outside factor of customers actually . . . paying for products and services. The existence of this uncertainty in the length of the Agreement is an express recognition by the parties of the wholly contingent nature of this Agreement.").

<u>Third</u>, the RSA does not contain a bankruptcy default provision or afford Itria any greater rights in the event of a bankruptcy. To the contrary, the RSA expressly provides that a bankruptcy filing by the Debtor does not constitute a material breach of the RSA. RSA at § 7.B(ii).

In *Womack v Capital Stack, LLC*, 2019 WL 4142740 (S.D.N.Y. Aug. 30, 2019), the court held that a receivables sale agreement similar to the RSA at issue here was not a loan agreement. In doing so, the court recognized that "[a]t least twenty-eight other recent decisions by State and

- 14 -

1  Federal courts in New York found that similar MCA transactions [*i.e.*, merchant cash advance

2  transactions involving the sale of receivables] were not loans[.]"  2019 WL 4142740 at * 7

3  (compiling cases).  Since *Womack* was decided in 2019, decisions have been issued in dozens of

4  additional cases holding that receivables sale agreements are not loan agreements.

5       **C.    The Fraud and Negligent Misrepresentation Claims Should be Dismissed**

6       "In alleging fraud, Rule 9(b) requires that a plaintiff "state with particularity the

7  circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).  To meet this heightened pleading

8  standard, the plaintiff must specify the time, place, and content of the alleged fraudulent

9  representations, as well as the names of the parties involved.  *Swartz v. KPMG, LLP,* 476 F.3d 756,

10  764 (9th Cir.2007).  *See also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

11  (the plaintiff must provide the "who, what, when, where, and how" of the alleged fraudulent conduct).

12  The heightened pleading requirements of Rule 9(b) also apply to negligent misrepresentation claims.

13  *Griffin v. Green Tree Servicing, LLC*, 166 F. Supp. 3d 1030, 1056 (C.D. Cal. 2015).

14       The thrust of the Debtor's fraud and negligent misrepresentation claims is that Itria

15  somehow misrepresented the nature of the RSA, even though the RSA plainly states that it is an

16  agreement for the purchase and sale of receivables and includes numerous terms that are specifically

17  tailored to a purchase and sale transaction rather than a loan transaction.  The Complaint thus includes

18  allegations that Itria misrepresented the nature and mechanics of the RSA, as well as allegations

19  that Itria breached the RSA by failing fund, by charging excessive fees, and by falsely claiming

20  that the Debtor had defaulted.  Complaint at ¶¶ 54 and 60.  The conclusory allegations lack any

21  detail regarding the specific time, place and content of the alleged misrepresentations, as well as

22  detail regarding the identity of the parties involved.  The Debtor also fails to explain how it

23  reasonably relied on the alleged misrepresentations or how it was damaged by them.  The lack of

24  detail falls well short of the heightened pleading requirements of Rule 9(b).

25       **D.    The Deceptive Acts or Practices Claim Should be Dismissed**

26       New York's deceptive acts or practices statute (Section 349 of New York General Business

27  Law) is a consumer protection law that prohibits "deceptive acts or practices in the conduct of any

28  business, trade or commerce or in the furnishing of any service" in the State of New York.  N.Y.

- 15 -

1    GBL § 349.  To assert a claim under Section 349, a consumer "must demonstrate that the acts or

2    practices have a broader impact on consumers at large.  Private contract disputes, unique to the

3    parties, for example, would not fall within the ambit of the statute."  *Oswego Laborers' Local 214*

4    *Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25 (1995).

5         Here, the Debtor fails to demonstrate that Itria's alleged conduct had any impact on

6    consumers at large.  This action is based upon a single funding transaction, and thus does not have

7    a "broader impact on consumers at large." As such, the Debtor's allegations cannot support a claim

8    under the statute.  *See QPBC, Inc. v. Total Auto. Warehouse, Inc.*, 117 A.D.3d 703, 704-705 (2d

9    Dept. 2014) ("the alleged misconduct did not have a broad impact on consumers at large

10   and . . . this case involved precisely the type of private contract dispute, unique to the parties, that

11   does not fall within the ambit of the statute"); *Biancone v. Bossi*, 24 A.D.3d 582, 583 (2d Dept.

12   2005) (dismissal of Section 349 claims where the action was based on a private contract between

13   the parties to a loan rather than conduct that affects consumers at large).

14        Further, "there can be no section 349(a) claim when the allegedly deceptive practice was

15   fully disclosed."  *Broder v. MBNA*, 281 A.D.2d 369, 371 (1st Dept. 2001).  *See Lebowitz v. Dow*

16   *Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. 2013) (when the terms of a bargain are fully disclosed

17   to the plaintiff before acceptance, no deceptive omission exists to give rise to a Section 349 claim);

18   *Citipostal, Inc. v. Unistar Leasing*, 283 A.D.2d 916, 918 (4th Dept. 2001) (affirming dismissal of

19   Section 349 claim because "the conduct complained of is specifically provided for by the parties'

20   agreement and was thus fully disclosed").

21        Here, the terms of the parties' agreement – including the $75,000 purchase price, the

22   $93,750 amount of the receivables sold, the 1.29% purchased percentage, the $1,953.13 weekly

23   payment, the $2,000 fees, and the $73,000 amount funded – were fully disclosed on the face of the

24   RSA.  As such, no deceptive act or practice occurred.

25        **E.    The Breach of Fiduciary Duty Claim Should be Dismissed**

26        To prevail on a claim for breach of fiduciary duty, the Debtor must establish the existence

27   of a fiduciary duty.  *Guzman v. Johnson*, 137 Nev. 126, 132 (2021).  The Debtor alleges that it had

28

- 16 -

a "special relationship" with Itria that "gave rise to fiduciary duties" (Complaint at ¶ 73), but it fails to allege any facts that would support the existence of a fiduciary duty.

In actuality, the only relationship between the parties is that of buyer and seller, which under Nevada law does not create a fiduciary relationship.  *See Long v. Towne*, 98 Nev. 11, 13 (1982) ("Generally, no fiduciary obligations exist between a buyer and seller of property.").

Moreover, the Debtor's assertion in the Complaint that the parties entered into a loan transaction, even if accepted as true, would not establish a fiduciary relationship.  *See Jordan v. Bank of America*, 2013 WL 5308268, at *5 (D. Nev. Sept. 19, 2013) ("Generally, a lender, or an assignee of an original lender, does not owe a borrower a fiduciary duty.").

## F.        The Constructive Fraud Claims Should be Dismissed

### 1.        The Constructive Fraud Claims Fail Because they are Based on the Debtor's Legally Baseless Usury Theory

The Debtor's constructive fraud claims (Counts 5, 6 and 7), like all of the other claims in the Complaint, are based on the theory that the RSA is a usurious loan agreement.  *See* Complaint at ¶¶ 78 and 85 (alleging that the transfers were made "based on the fraudulent and usurious Loan Agreement").  For reasons discussed above, the RSA is not a loan agreement and, accordingly, there is no legal basis for a claim of usury.  Because the Debtor's constructive fraud claims are a usury-based claims, they should be dismissed.

### 2.        The Constructive Fraud Claims Fail Because the Debtor Had No Ownership Interest in the Property Transferred to Itria

The Debtor can only avoid a transfer "of an interest of the debtor in property[.]"  11 U.S.C. § 548(a)(1).  The Debtor cannot satisfy this statutory element of the claim because it had no ownership interest in the property that was transferred to Itria.

Under the terms of the RSA, the Debtor "irrevocably, unconditionally and absolutely" sold to Itria all of its "right, title and interest (whether legal, equitable or beneficial)" in the amount of the Receivables that were sold, and title was "vested solely" in Itria.  RSA at § 2(a).  Accordingly, the Debtor had no ownership interest in the Receivables that were remitted to Itria under the terms of the RSA.  *See In re R&J Pizza Corp.*, 2014 Bankr. LEXIS 5461 at *15 (Bankr. E.D.N.Y. Oct. 14, 2014) (holding that merchant cash advance agreement governed by New York law represented a

- 17 -

true sale of the debtor's future receivables and, as a result, the debtor retained no ownership rights in the transferred receivables).

### 3. The Debtor has Failed to Adequately Plead that it Received Less Than Reasonably Equivalent Value

To prevail on a constructive fraud claim, the Debtor must prove that, with respect to each transfer at issue, it received less than reasonably equivalent value in exchange for such transfer. 11 U.S.C. § 548(a)(1)(B)(i); N.Y. DCL § 273(a)(2). The Debtor recites this statutory element, but provides no support – and, to be sure, no plausible support – for this allegation. *See* Complaint at ¶¶ 80 and 86. Absent support, the Debtor has failed to plausibly allege that the Debtor received less than reasonably equivalent value in exchange for each of the transfers at issue. *See Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520-21 (Bankr. D. Del. 2012) (dismissing constructive fraud claim on grounds that the complaint "merely recites the statutory elements of this claim, pleading no facts to support this claim or that give rise to an inference that [the debtor] received less than a reasonably equivalent value.").

In fact, the Debtor received significant value in the form of the funding that was advanced by Itria under the RSA, which the Debtor acknowledges having received. Complaint at ¶ 19. Because the transfers at issue here were remittances made by the Debtor to Itria under the terms of the RSA, they were made for reasonably equivalent value because they were made in repayment of a claim or right to payment under state law. *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1147 (9th Cir. 2013) (holding that "a transfer is for 'reasonably equivalent value' for purposes of § 548(a)(1)(B)(i) if it is made in repayment of a 'claim,' i.e., a 'right to payment' under state law."); *In re Sharp Int'l Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005) (holding that transfer made to lender in partial satisfaction of outstanding debt was made for fair consideration under New York law based on "the broad principle that 'the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property'") (quoting *Pashaian v. Eccleston Properties*, 88 F.3d 77, 85 (2d Cir. 1996)).

In *In re A Goodnight Sleepstore, Inc.*, 2019 WL 342577 (Bankr. E.D.N.C. Jan. 25, 2019), the court rejected a constructive fraud claim asserted by a Chapter 7 trustee against a merchant cash advance company that advanced a total of $211,190 to purchase a total of $301,000 of the debtor's

1   receivables (*i.e.*, it provided up-front advances equal to approximately 70% of the amount of the

2   receivables purchased).  In determining that the debtor had received reasonably equivalent value,

3   the court found that "the Debtor received something of value – the cash infusions under the

4   Agreements – and [merchant cash advance company] got something back from the Debtor, a daily

5   payment to satisfy a legal obligation."  2019 WL 342577, at *11.

6         The court's reasoning in *Goodnight Sleepstore* applies equally here.  Under the terms of the

7   RSA, Itria paid $73,000 to purchase $93,750 in receivables (*i.e.*, it provided an up-front advance

8   equal to approximately 78% of the amount of the receivables purchased, which percentage was

9   significantly more favorable to the Debtor than the 70% that was provided to the debtor in the

10  *Goodnight Sleepstore* case).  Further, the amount transferred by the Debtor to Itria (which the

11  Debtor alleges to be "at least $65,000," although the Debtor only identifies transfers totaling

12  approximately $37,000) is ***less than*** the $73,000 amount that the Debtor received from Itria.  Thus,

13  the Debtor not only received reasonably equivalent value, it received value ***in excess of*** the amount

14  of the transfers at issue.  Given these facts, the Debtor cannot plausibly allege that it received less

15  than reasonably equivalent value in exchange for the transfers at issue.

16      **4.**      **The Debtor has Failed to Adequately Plead Insolvency**

17        The Debtor represented and warranted to Itria in the RSA that it was "financially solvent

18  (i.e., the value of its assets is more than its liabilities) as of the Effective Date."  RSA at § 6(E)(i).

19  Despite making this representation, the Debtor alleges in the Complaint that it "was insolvent, based

20  on its debts exceeding its assets and the general inability to pay its debts as they came due, on the

21  dates the Transfers were made – and Defendant was aware of this fact at the time of the Loan

22  Agreement and at the time of each transfer by Defendant to Plaintiff."  Complaint at ¶¶ 81 and 87.

23  The Debtor fails, however, to support its allegation of insolvency with any financial information.

24        The Debtor, of course, should have access to information regarding its financial condition

25  at the time of the transfers at issue, but it has failed to include such information in the Complaint.

26  The lack of plausible evidence of the Debtor's alleged insolvency at the time of the transfers at issue

27  is fatal to the Debtor's constructive fraud claims.  *See In re Trinsum Group, Inc.*, 460 B.R. 379, 392-

28  94 (Bankr. S.D.N.Y. 2011) (dismissing constructive fraud claim, and noting that "there must be some

905680341.1

sort of financial data or analysis provided so that the court can infer the company's liabilities exceeded its assets at the time the transfers in question took place").

### G.    The Complaint Should be Dismissed With Prejudice

Although the Court has discretion to grant or deny leave to amend after dismissal, leave to amend should not be granted "where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Here, amendment would be futile because the Debtor will not be able to cure the defects in the Complaint through the allegation of other facts. Accordingly, the Complaint should be dismissed with prejudice.

### CONCLUSION

For the reasons set forth herein and such other reasons that may be presented at any hearing on the motion, the Court should compel arbitration of the claims asserted in Counts 1, 2, 3, 4 and 8 of the Complaint and stay this adversary proceeding pending completion of the arbitration. In the alternative, the Court should dismiss all claims asserted in the Complaint with prejudice.

### STATEMENT PURSUANT TO LR 7008

Pursuant to Local Rule 7008, Itria consents to the entry of final orders or judgment by this Court in this adversary proceeding if it is later determined that this Court, absent consent of the parties, does not have authority to enter final orders or judgment consistent with Article III of the United States Constitution.

Dated this 28th day of October 2024.

SMITH LARSEN & WIXOM

*/s/ Karl L. Nielson*
Michael B. Wixom, Esq.
Nevada Bar No. 2812
Karl L. Nielson, Esq.
Nevada Bar No. 5082
1935 Village Center Circle
Las Vegas, NV  89134

and

C. Kevin Kobbe, Esq.
Admission *pro hac vice* pending

- 20 -

905680341.1

1

2

DLA PIPER LLP (US)
650 South Exeter Street, Suite 1100
Baltimore, Maryland 21202

3

*Counsel for Itria Ventures LLC*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 21 -

905680341.1